CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

IVANA DJAK (NYBN 5516687)
Assistant United States Attorney

1301 Clay Street, Suite 340S
Oakland, California 94612
Telephone: (510) 637-3918
FAX: (510) 637-3724
ivana.djak@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRICE BURFORD,<br><br>Defendant. | CASE NO. 26-CR-264 YGR<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Date: October 1, 2026<br>Time: 9:30 a.m.<br>Judge: Hon. Yvonne Gonzalez Rogers |

## INTRODUCTION

On October 24, 2025, at about 12:30 p.m., the Defendant was the sole occupant inside Room 109 at the Laurel Inn located on MacArthur Boulevard, Oakland, California, when Oakland Police Department ("OPD") Officers issued commands outside the room in order to execute a search warrant. At that time, the Defendant threw two firearms out of the window of Room 109 onto the sidewalk and grass below. One of those firearms was reported stolen by its registered owner. OPD Officers were there to search the room because the Defendant was a suspect in a robbery that had occurred on the Oakland Blade on October 16, 2026.

The Defendant has a serious criminal history, including misdemeanor convictions for domestic violence as well as possessing a loaded firearm. He has incurred multiple arrests in the past few years.

As part of a violent crime reduction initiative in Oakland, the Defendant was charged with and ultimately pleaded guilty to being a prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(9).

For the reasons set forth below, the government requests that the Court sentence the Defendant to 26 months of imprisonment, a three-year term of supervised release, and with the conditions recommended by probation and set forth in the plea agreement.

## BACKGROUND

### I. The Illegal Possession of Firearms Poses an Unacceptable Danger to Oakland

The relevant conduct in this case is described below, but the Defendant's conduct in this case did not occur in a vacuum. Rather, the Defendant's illegal possession of a firearm helps to fuel the wave of gun violence that is and has been ravaging Oakland. The proliferation of illegal firearms amplifies the issue of violent crime, as robberies, burglaries, domestic violence incidents, or even routine altercations like road rage incidents, carry the potential to become deadly when the participants are armed. Illegal firearms are also central to the challenge of gang violence, with groups of young armed people too often turning residential neighborhoods into combat zones. Although the rate of shootings has fallen from its peak in 2023, the number of shootings and gun-related murders remains unacceptably high.

Harrowing statistics underscore the damage illegal firearms inflict on Oakland. In 2025, the city suffered 67 homicides, at a rate of 15 homicides per 100k residents. This homicide rate is *five times* the rate of San Francisco, and also substantially higher than neighboring cities in Berkeley and San Leandro.



| City | 2025 Population | Homicides 2025 | Homicides (per 100k) |
|---|---|---|---|
| *Oakland* | *444,196* | *67* | *15* |
| SF | 826,079 | 28 | 3 |
| Los Angeles | 3,874,000 | 230 | 6 |
| Berkeley | 123,195 | 1 | 0.8 |
| San Leandro | 86,587 | 3 | 3.5 |
| San Jose | 993,000 | 24 | 2.4 |

It is not a mystery why Oakland has suffered so many more homicides than its neighbors. It is because of illegal firearms. Of the 67 homicides in 2025, 65 of them were committed with a firearm, and only 2 involved some other means. Indeed, as part of the violent crime reduction initiative, one of the other defendants charged—not Burford—had engaged in a shootout in a crowded downtown Oakland nightclub in the early morning of March 7, 2026, in which two people were killed—including a schoolteacher who was shot as she attempted to run from the gunfire—and at least five others also suffered gunshot wounds during the incident. *See United States v. Jarvis Toussaint*, Case No. 4:26-cr-00235-JSW, Dkt. 1.

And the problem is not limited to murders. There were 350 individuals who were shot in 2025, many suffering gruesome injuries with lifelong impacts. Oakland also saw 1,674 robberies and 2,950 aggravated assaults in 2025. As with homicides, Oakland suffers robbery and aggravated assaults at a much higher rate when compared with its neighbors. And a substantial portion of these violent crimes also involved firearms. Indeed, these violent confrontations, when mixed with illegally possessed firearms, all too often escalate into a shooting or a murder.

Nor has the problem abated in 2026. Through only the first quarter of 2026, Oakland had already suffered 13 homicides, 374 robberies (102 involving firearms), 588 aggravated assaults, and 53 assaults with a firearm (including shootings and injuries by firearms). These statistics are staggering.

This is also not a problem that is limited to people already involved in criminal activity. Every resident of Oakland is made less safe by these illegal guns. Innocent bystanders uninvolved in criminal activity have been maimed and killed. For example, in 2021, an almost two-year old boy was shot and killed in his car seat in his family vehicle when gang members engaged in a shootout on I-880 in Oakland. And, as described above, in March 2026, an innocent 33-year-old middle school teacher was murdered at a mass shooting at a night club in Oakland.

These tragedies and grim statistics are astounding, and they are unacceptable. Oakland has suffered enough. The proliferation of illegal firearms is not a trivial matter, but a direct threat to the safety of the community. The Defendant's offense is grave and must be set against this context of a culture of violence in Oakland that must be disrupted.

**II. Offense Conduct – The Defendant was Found with a Firearm Following a Robbery**

On October 16, 2025, at approximately 1:05 a.m., the Oakland Police Department ("OPD") responded to the report of a robbery. Presentence Investigation Report ("PSR") ¶ 7. The victim of the robbery reported that at about 1:00 a.m. on October 16 he was driving in the area of 20th Avenue and International Boulevard in Oakland, when he observed a woman, later identified as L.N., with whom he had contact with approximately three days prior and had exchanged telephone numbers. *Id.* L.N. was standing on the corner and appeared to be a prostitute. The victim drove himself and L.N. to the 1200 block of 21st Avenue and parked in a parking spot. L.N. then started to demand money from the victim, but he refused. *Id.* L.N. then texted someone and approximately five minutes later, a small white sedan parked behind him, and a male suspect exited and approached the victim at the driver's side door. The victim continued refusing the demands for money, and the man, later identified as Brice Burford, and L.N. began to punch the victim with closed fists. The victim reported that the woman and man who assaulted him also stole his wallet, laptop, and iPad. *Id.*

During the investigation, OPD identified L.N. and Brice Burford as the subjects who assaulted and robbed the man. PSR ¶ 8. Following further investigation and the issuance of search and arrest warrants, on October 24, 2025, at approximately 12:04 p.m., OPD officers observed L.N. exit Room 109 of the Laurel Inn on MacArthur Boulevard in Oakland and arrested her in the lobby of the hotel. *Id.* ¶ 9. At approximately 12:30 p.m. on October 24, 2025, OPD officers issued commands outside of Room 109 to clear the room pending a search warrant. Laurel Inn surveillance video showed Burford, who was the only occupant in Room 109 at the time, stick his head out of the window and throw two firearms wrapped in towels out of the window. *Id.* Shortly thereafter, officers arrested Burford for violating a

restraining order prohibiting him from being in contact with L.N., related to a previous domestic violence incident. PSR ¶ 9.

During the search of Room 109, officers noticed the bathroom window facing the rear walkway was open. PSR ¶ 10. Officers searched outside of the window beneath Room 109, and located an AK-47 style assault rifle, identified as a Century Arms, US VSKA AK (Draco Style) pistol (serial number: SV7122424), next to one live rifle round and a banana-shaped rifle magazine, and a stolen Glock 22, Gen 4, Austria handgun (serial number WRU331) with an extended magazine. *Id.*

Subsequently, a United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent physically reviewed the firearms and confirmed that neither was made in California. The Glock magazine had a capacity to hold 22 rounds and was loaded with 15 rounds of ammunition. The Draco style pistol had a 40-round magazine with 33 rounds loaded. PSR ¶ 11.

Moreover, the robbery that preceded the Defendant being found with the firearms, occurred on the Oakland Blade. A "blade" is an area where commercial sex work occurs, and the most active blade in Oakland is located in and around International Boulevard, between approximately 5th Avenue and 23rd Avenue. International Boulevard is known throughout the San Francisco Bay Area for prostitution activity and is a center of violent crime.

## III. Criminal History

The Defendant has a serious criminal history. In January 2023, he incurred a misdemeanor conviction for carrying a loaded firearm in public and was sentenced to one year in jail. In that September 2021 incident, he threatened a victim with his firearm. PSR ¶ 29. In January 2023, he incurred a misdemeanor conviction for domestic violence for a March 2022 domestic violence incident involving L.N., who was 17 years old at the time and sustained lacerations to her face. The Defendant was sentenced to 276 days in jail and three years of probation. *Id.* In June 2025, the Defendant was arrested for driving under the influence of marijuana. *Id.* ¶ 34. In January 2023, he was arrested for burglary and vandalism. *Id.* ¶ 36. And in July 2024 he was arrested for domestic violence. *Id.* ¶ 37.

## IV. Procedural Posture

On March 31, 2026, the government charged the Defendant in a criminal Complaint with a violation of 18 U.S.C. § 922(g)(9) – Prohibited Person in Possession of a Firearm. Dkt. No. 1. On May 28, 2026, the Defendant was charged in a one-count Information with being a prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(9). Dkt. No. 13. On July 9, 2026, the Defendant pled guilty to Count One of the Information pursuant to a plea agreement. Dkt. Nos. 19, 20. Sentencing is set for October 1, 2026.

## ARGUMENT

## I. Legal Standard

The United States Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include (among other factors):

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

## II. Sentencing Guidelines Calculation

As set forth in the PSR and the plea agreement, the Sentencing Guidelines calculations for Defendant's offense level are as follows:

| | U.S.S.G. Section | Level/Points |
|---|---|---|
| Base offense level | § 2K2.1 (a)(4)(B)–semiautomatic firearm | 20 |
| Specific offense characteristics | § 2K2.1 (b)(4)(A) – stolen firearm | +2 |
| Acceptance of responsibility | § 3E1.1 | -3 |
| Total offense level | | 19 |

PSR ¶¶ 16–26.

The Probation Officer concluded that Defendant's criminal history score is 5, and he therefore falls into Criminal History Category III. PSR ¶¶ 31–33. As reflected in the PSR, the Guidelines range for imprisonment associated with adjusted offense level 19 and Criminal History Category III is 37 – 46 months of incarceration. *Id.* ¶ 91. The Probation Officer recommends a 24-month sentence to be followed by three years of supervised release. *Id.* at Sentencing Recommendation.

In accordance with the plea agreement, the government recommends 30 perfect below the low end of the range associated with the Guidelines calculation set out above, specifically, 26 months in custody, to be followed by three years of supervised release.

**III. The United States' Sentencing Recommendation**

Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends a custodial sentence of 26 months imprisonment——to be followed by a three-year term of supervised release. This sentence accounts for a 30 percent downward variance from the advisory guideline range. *Id.* Consistent with 18 U.S.C. § 3553(a), such a sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense and to provide deterrence, but also to account for relevant mitigating factors.

As discussed above, gun violence has plagued Oakland for far too long. In an effort to tackle this problem, beginning in March 2026, federal and local law enforcement coordinated efforts in a surge of federal firearm enforcement measures in Oakland and the East Bay that resulted in the seizure of 76 illegally possessed firearms and 51 defendants charged. The Defendant possessed two loaded guns.

The government's recommended sentence in this case therefore plays a key role in its efforts to disrupt the cycle of gun violence in the East Bay by deterring the Defendant from yet again possessing

dangerous guns once released, and others like the Defendant who continue to threaten the safety of the East Bay community by illegally possessing firearms. This, in turn, reflects the need for the sentence to promote respect for the law and afford general deterrence. *See* U.S.S.G. § 3553(a)(1), (a)(2)(A)–(B).

In addition, for characteristics of the Defendant, specific deterrence, and to protect the public from further crimes of the defendant, it is notable that the Defendant has incurred a previous firearm conviction as well as a domestic violence conviction and domestic violence arrests. Many of these convictions and arrests occurred while he was on some form of supervision. *See* U.S.S.G. § 3553(a)(2)(C)–(D). The Defendant's longest prison term to date was a year in custody, and that sentence did not deter him from again possessing a firearm and ammunition, and from engaging in further violence. A sentence of 26 months will represent the Defendant's longest sentence to date, and will hopefully put an end to the Defendant's dangerous criminal misconduct.

The Defendant's request for a term of 12 months is unreasonable. He has already served exactly that term and continued to engage in criminal conduct. The conduct at issue here is serious and warrants a substantial term. Additionally, local authorities are currently investigating whether the Defendant was involved in smuggling drugs into jail during the pendency of this case. PSR ¶ 6 n.1.

However, the Defendant also took early and full responsibility for his criminal misconduct. The government is optimistic that this case will serve as an inflection point for the Defendant. He cannot continue to engage in behavior that threatens the public and results in his continued incarceration. The Defendant has a two-year old child he wants to be present for—and hopefully after this term, he will be.

## CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence Defendant to 26 months in prison followed by a three-year term of supervised release.

DATED: September 24, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/
IVANA DJAK
Assistant United States Attorney